IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
May 24, 2022 Session

## STATE OF TENNESSEE v. DANIEL HICKMAN

**Appeal from the Criminal Court for Knox County**
**No. 108343   Steven Wayne Sword, Judge**

_____

### No. E2021-00662-CCA-R3-CD

_____

Defendant, Daniel Hickman, appeals his convictions for criminally negligent homicide and especially aggravated robbery, for which he received an effective 27-year sentence.  On appeal, Defendant contends that (1) the evidence is insufficient to support his convictions; (2) the trial court erred in excluding evidence supporting the defense theory that a third party committed the offenses in violation of Defendant's right to present a defense; (3) the trial court erred in admitting the entire audio recording of Defendant's interview with police and photographs taken of Defendant during the interview; (4) the trial court erred in admitting testimony regarding a prior suspect's willingness to take a polygraph examination; (5) the jury improperly considered a lesser included offense for especially aggravated robbery in violation of the trial court's sequential jury instructions; and (6) the cumulative effect of the errors deprived Defendant of his right to a fair trial.  Upon reviewing the record, the parties' briefs, oral arguments and the applicable law, we affirm the judgments of the trial court.

### Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed

TIMOTHY L. EASTER, J., delivered the opinion of the court, in which JILL BARTEE AYERS, J., joined.  JOHN EVERETT WILLIAMS, P.J., not participating.[1]

Chelsea C. Moore (on appeal); and Keith Lowe (at trial), Knoxville, Tennessee, for the appellant, Daniel Hickman.

---

[1] Judge Williams, the Presiding Judge of the Court of Criminal Appeals, died on September 2, 2022.  The members of this panel of the Court acknowledge Judge Williams's steadfast leadership, sharp wit, and overall positive influence on the judiciary during his many years of service to Tennessee.  He will be greatly missed by all of his colleagues.

Herbert H. Slatery III, Attorney General and Reporter; Katherine C. Redding, Senior Assistant Attorney General; Charme P. Allen, District Attorney General; and Leslie Nassios, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

### *Evidence Presented at Trial*

According to the evidence presented at trial, Defendant and his co-defendants, Morgan Ward, Chelsea Lauderdale, and Amber Hill, devised a plan to rob the victim, William Lake Aaron. The victim was a drug dealer who was known to keep a large amount of cash and drugs in his home in Knoxville, Tennessee. During the evening hours of May 28, 2015, Defendant entered the victim's home hiding a tool in his sleeve, while the co-defendants remained in Morgan's car parked outside the home. Defendant struck the victim multiple times on his head, killing him, and took cash and drugs from the home. Defendant and the co-defendants divided the cash and drugs and fled to Jacksonville, Florida. Ward and Hill subsequently returned to Knoxville, and Defendant and Lauderdale fled to Michigan where they were apprehended by police. Defendant and the co-defendants were charged with felony murder and especially aggravated robbery. Defendant was tried separately from the co-defendants. The defense at trial was that the victim's son, John Nichols, committed the offenses.

### *The Discovery of the Victim's Body*

The victim sold marijuana and pills out of his home to select friends and generally required them to call him before coming to his home to purchase drugs. One of the victim's customers was Defendant's grandmother, Evelyn Baumann, and several of the victim's friends testified to seeing Defendant at the victim's home with Ms. Baumann on multiple occasions. The victim also loaned friends money on occasion and maintained a list of those who owed him money and the amounts on a board in his bedroom

Richard Denton testified that the victim maintained a safe in his bedroom but that he was unaware of what items the victim kept inside the safe. The victim generally kept a large amount of cash on his person, and Richard Denton had warned the victim to keep his cash "out of sight."

Matthew Denton, Richard Denton's son, testified that the victim would go into his bedroom whenever someone came to his home to purchase drugs, and Matthew Denton was "pretty sure" the victim kept the drugs in the bedroom. The victim placed a hasp with

a padlock on his bedroom door. Whenever someone came to his home who he did not trust and who was outside his circle of select friends, he locked the bedroom door.

The victim's friends who testified at trial considered the victim to be peaceful or passive, and they did not believe he owned a gun. The victim told Richard Denton that he did not own a gun and that he was unable to purchase a gun due to a prior conviction. Rather, the victim relied on his two dogs for protection. The victim had a large dog that remained on the victim's front porch and a small dog that had "the run of the house."

On May 28, 2015, at around 3:30 p.m., Matthew Denton and his girlfriend, Christy Birdwell, visited the victim at his home, and Matthew Denton testified that the victim appeared "like his regular self." Around 7:00 or 7:30 p.m., Billy Holder visited the victim at his home and they watched television for "[a] couple hours." Mr. Holder testified that the victim was wearing a black t-shirt, suspenders, brown khaki shorts, socks, and shoes. The victim sat on a couch located next to the front door, and his small dog sat beside him. He did not have his bedroom locked when Mr. Holder was there. Mr. Holder did not know what the victim kept in his safe or where the victim kept his drugs and his money. Mr. Holder said the victim sometimes kept a large amount of money in his pockets. Mr. Holder did not recall the victim receiving any telephone calls that he did not answer. Mr. Holder completely shut the front door when he left the house. The victim remained on his couch watching television. Mr. Holder did not know whether the victim was expecting anyone else that night.

The victim spoke to Leonard Branner during the late afternoon hours of May 28th about meeting the following day to help a friend move furniture. When Mr. Branner did not hear from the victim on May 29th, Mr. Branner believed the victim recruited another friend to help move the furniture. Matthew Denton began calling the victim on the morning of May 29th to purchase marijuana from him, but the victim did not answer his calls. Matthew Denton contacted a mutual friend, who stated that the victim was supposed to meet the friend at 10:00 a.m. but failed to do so.

Matthew Denton and Ms. Birdwell were unable to reach the victim, and they went to his home. Matthew Denton approached the door to knock and saw that the door was ajar and was not latched. The television was "blasting," and Matthew Denton could not see or hear the victim's small dog, which generally went to the window and barked whenever Matthew Denton and Ms. Birdwell came to the victim's home. Matthew Denton called Richard Denton, who did not live far from the victim. Richard Denton stated that the victim was diabetic, had a missing toe, and was known to fall. Richard Denton instructed Matthew Denton to come to his home and drive him to the victim's home.

Richard Denton, Matthew Denton, and Ms. Birdwell entered the home where they found the deceased victim lying face down on the living room floor by a couch. A pool of blood was beside the victim. Richard Denton noticed that the victim's bedroom door had been kicked open and that the "padlock was knocked off the door[.]" He believed that someone robbed the victim. He heard the victim's small dog barking from the bedroom located in the back of the home. He said that the dog usually had "the run of the house" and that the victim would have placed the dog in the back bedroom if someone was present in the home who believed the dog would bite. After they exited the home, Ms. Birdwell called 911, and they waited for the police to arrive. According to the CAD report, Ms. Birdwell called 911 at approximately 3:55 p.m.

*Testimony of Co-Defendant Chelsea Lauderdale*

Chelsea Lauderdale testified that in 2015, she was 21 years old and had suffered from a drug problem for about four years. She consumed methamphetamine, pills, and "anything [she could] get her hands on." In 2015, she was on probation for a felony theft conviction in Jefferson County and continued to violate the terms of her probation through her drug use. The court ordered her to a rehabilitation facility, but her treatment was unsuccessful. She was released from the facility in May 2015. In late May 2015, she moved into the apartment of her cousin, Cody Smith, in Knoxville where she began using drugs again.

Lauderdale testified that she grew up with Defendant, Ward, and Hill, who was also a cousin through marriage. Lauderdale and Defendant, who had recently returned from Florida, were in a relationship at the time of the offenses. Lauderdale testified that on May 28, 2015, she, Ward, Hill, and Defendant went to the victim's home to purchase marijuana. Defendant entered the victim's house, while Lauderdale, Ward, and Hill remained outside, and Defendant had marijuana with him when he exited the house. They returned to Mr. Smith's apartment where they began discussing ways to obtain money to purchase more drugs. Lauderdale said they discussed "car popping" where they would steal items left in unlocked cars. Defendant stated that the victim had a large amount of money and drugs and would be an easy person to rob.

Lauderdale stated that sometime between 6:00 and 8:00 p.m., Defendant used Lauderdale's cell phone to call the victim. Defendant and the co-defendants went outside of Mr. Smith's apartment where Defendant and Ward began discussing means of protection if something were to occur during the robbery. Lauderdale testified that Defendant and Ward went to the trunk of Ward's Honda car where Defendant retrieved a long metal item with a "circle end" and slid the item up the sleeve of his jacket. Lauderdale was unsure what the item was. They went to the victim's home in Ward's car.

- 4 -

Lauderdale testified that they arrived at the victim's home around dusk when the sun was beginning to set. Ward parked his car on the side of a road near the victim's home. Defendant exited the car, walked across the street, knocked on the victim's door, and was allowed inside by someone who Lauderdale did not see. While Defendant was inside the home, the co-defendants remained inside the car and discussed the drugs that they hoped to obtain. After 15 to 20 minutes, Defendant exited the victim's home and walked at a fast pace to the car. Lauderdale stated that once Defendant entered the car, he appeared "kind of anxious" and nervous. He told Ward, "Let's go," and Ward drove away while squealing tires and "flooring it basically." When asked whether Defendant was carrying anything, Lauderdale replied, "At that point in time[,] I d[id] not know that he dropped it back down beside him." She stated that the object had been in Defendant's sleeve. Although Lauderdale knew that Defendant had a weapon when he entered the victim's house, she stated that she believed that Defendant was going to enter the victim's home, take the victim's drugs, and leave.

Lauderdale testified that Defendant returned with drugs in a pill bottle and "[t]housands" of dollars in cash, some of which was wrapped in black bands. Lauderdale began sorting the drugs. She stated that because it was dark outside and difficult to see, the four of them decided to find a place where they could sort the drugs. Ward drove them to a river off of Thorn Grove Pike in Knoxville. Lauderdale stated that she had accompanied Ward to the location on a prior occasion but that only Ward knew how to find the location. While Lauderdale and Hill remained in the car to sort the drugs, Ward and Defendant walked to the river. Lauderdale stated that although she did not "exactly" know why Ward and Defendant walked down to the river, she was aware that Defendant's weapon was no longer in the car and believed they had taken the weapon with them.

Once Ward and Defendant returned to the car from the river, the group divided the money equally. Lauderdale and Defendant decided to combine their money into one lump sum. They returned to Mr. Smith's apartment, and Lauderdale gave Mr. Smith $100. Lauderdale explained that she felt obligated to give Mr. Smith money because he had allowed her to stay at his apartment and he needed the money.

Lauderdale testified that she, Defendant, Ward, and Hill discussed where they should go. Defendant stated that he knew people in Florida, and they decided to go to Jacksonville Beach. They rode in a cab to the Greyhound bus station where they purchased bus tickets to Jacksonville, Florida. They then went to Walmart where they used money taken from the victim to purchase clothing, cell phones, and hygiene products. Lauderdale and Defendant each purchased a silver Samsung cell phone at a cost of approximately $1,000 each. The group rented a motel room located within walking distance of the bus station. Lauderdale stated that she first noticed blood on Defendant's hands when she tried to hold Defendant's hand but he would not allow it due to the blood.

Defendant and the co-defendants left on a bus for Florida around lunch on May 29th. Following a layover in Atlanta, Georgia, they arrived in Jacksonville on May 30th, rented a motel room on Beach Boulevard, and went to the beach. Lauderdale used her newly purchased cell phone to post photographs on her Facebook page of the group taken while at the bus terminal and on the beach. Lauderdale acknowledged that they enjoyed themselves at the beach and did not discuss what happened to the victim. They were using drugs and partying. Lauderdale testified that at that time, her primary focus was "getting high" and how and when she was going to "get [her] next high." She stated that Defendant also was enjoying himself on the beach and "didn't seem too worried about anything." After Ward and Hill went out together one night, Lauderdale and Defendant went to a strip club and returned to the motel room with a stripper named Katie. When Ward and Hill returned to the motel room, they were angry because Lauderdale and Defendant had spent a large amount of money. After arguing, Ward and Hill left, and Lauderdale believed they returned to Knoxville. Lauderdale denied that Ward drove her to Savannah, Georgia.

Lauderdale stated that she passed out later that night after she ingested a large amount of drugs and smoked synthetic marijuana. Katie, who also had access to the money obtained during the robbery, called the police. Lauderdale awoke to police officers and firemen standing around her. She refused their services, and the owner of the motel told Lauderdale and Defendant that they had one hour in which to leave. Lauderdale and Defendant packed whatever they could fit into a small backpack. They left behind several articles of clothing, including the jacket that Defendant wore on the night of the offenses.

Lauderdale and Defendant walked to an abandoned house where they remained for the next "little bit." They had spent all of their money "going out every night, going to bars, doing drugs," and Defendant had been purchasing synthetic marijuana. Defendant slept on park benches on some nights, and Lauderdale panhandled for money to purchase food and synthetic marijuana for Defendant. Lauderdale eventually contacted Defendant's mother in Michigan, who arranged to purchase two bus tickets to Michigan for Defendant and Lauderdale.

Lauderdale recalled a telephone call between Defendant and his grandmother in Knoxville during which Defendant was upset and stated, "Mamaw, that hurts me. . . . That really gets to me, because that was—he would help me out a lot. He was really—I was really close to him." After the telephone call, Defendant told Lauderdale that he thought he had killed a man but that he was unsure. Lauderdale stated that she did not realize Defendant was referring to the victim until after they were arrested. She acknowledged that they went to the victim's home to commit a robbery and that Defendant exited the home with drugs and money. She stated that the group never discussed the robbery while they were in Florida. She acknowledged that she had not cared about what happened to

the victim, that she was focused on taking drugs, and that she "wasn't worried about how [Defendant] got them."

Lauderdale and Defendant rode a bus to Saginaw, Michigan, and went to the home of Defendant's mother and step-father. On the following day, June 16, 2015, the police came to the home, arrested Lauderdale and Defendant, and transported them to the Saginaw County Jail. Lauderdale later waived her rights and was interviewed by Investigator Jeremy Maupin of the Knoxville Police Department ("KPD"). She said she was sober during the interview but acknowledged that she did not tell Investigator Maupin the entire truth regarding her involvement in the robbery. She explained that she was afraid and was trying to protect herself and Defendant. She admitted to Investigator Maupin that she was aware of the planned robbery and that Defendant took a weapon into the house. However, she did not tell Investigator Maupin the truth about what happened to the weapon. She later accompanied Investigator Maupin to the area near a river where Ward drove following the offenses to show the investigator where the weapon could be located.

Lauderdale testified that at the time of trial, she was charged with felony murder and especially aggravated robbery. She explained that she was testifying because she was told that if she offered truthful testimony, "the murder charge [would] be dropped." She was aware that the State had only agreed not to pursue the felony murder charge, that there were many lesser included offenses of felony murder, and that she was still facing the especially aggravated robbery charge.

On cross-examination, Lauderdale testified that even though she had a significant drug problem at the time of the offenses, was taking a large number of pills, and was "high" about 90 percent of the time, she was able to recall the events. She acknowledged that she told the investigators that she was so "stoned" that she did not know what occurred during that time and that she was lucky to remember her name. She also told the investigators that she had taken about $700 worth of drugs on the day in which she was released from the rehabilitation facility and another $700 worth of drugs on the following day. She testified that while her statement to the investigators was "an exaggeration," she "stayed messed up" during that period. She stated that she had been stealing to feed her drug habit and that she likely would have done just about anything to obtain drugs, including lying.

Lauderdale said she was sober when she spoke to the investigator because she did not have any money or any other way to obtain pills while in Michigan. She was aware that she was facing a murder charge when she spoke to the investigator and acknowledged that she was willing to lie to him to stay out of jail. She maintained that at the time of trial, she was no longer willing to lie to stay out of jail and that she was testifying truthfully. She acknowledged that before she discussed the events in detail during the interview, the investigator told her that he believed she had remained in the car during the robbery, which

was beneficial to her. Lauderdale testified that she lied to the investigator when she stated that she believed the group was only going to the victim's home to purchase marijuana. She agreed that she told the investigator that the group went to the victim's home to rob him only after the investigator told her that he believed their intended purpose of going to the home was to rob the victim.

Lauderdale testified that when the group initially went to the victim's house on the day of the offenses, they did so without first calling the victim. Before going to the victim's house for the purpose of robbing him, Defendant called the victim while still at Mr. Smith's apartment. Lauderdale stated that after Defendant called the victim, she, Defendant, Ward, and Hill remained at Mr. Smith's apartment for 20 to 25 minutes and gathered their possessions to leave. Lauderdale estimated that she took ten minutes to gather her purse and bag of drugs, explaining that she was an "IV user" and had to gather her "needles and stuff up and put them away." After exiting the apartment, Ward and Defendant remained at the trunk of Ward's car for five to ten minutes before they drove to the victim's home, which was an estimated ten-minute drive. Lauderdale was not "a hundred percent positive" that they arrived at the victim's home about one hour after Defendant called him and did not know what time they arrived. She did not see Mr. Holder at the victim's home.

Lauderdale testified that Defendant remained inside the victim's home for 15 to 20 minutes. Defendant was the only person who entered the home, and Lauderdale did not know what occurred inside the home. She agreed that Defendant took a weapon inside the home, and she recalled telling the investigators that the weapon could have been a tire tool based on its appearance but that she was unsure what the weapon was. She described the weapon as having "a circle at the end" with a hole in the circle and a "rod that holds it together." She stated that the weapon was not a tire iron or a wrench but that it could have been a "normal wrench." She was unsure whether any blood was on the tool after Defendant exited the victim's home. Lauderdale initially told the investigator that she did not know what happened to the weapon. However, "within the last two weeks" prior to trial in 2018, she told investigators about the river where the weapon was discarded. She explained that she did not inform investigators in 2016 because she was still trying to protect Defendant and herself. She explained that she did not tell investigators in 2017 because she was pregnant and "was more concerned about getting [her] life in order."

Lauderdale testified that when the investigator asked her about Defendant's emotional state after leaving the victim's home, she responded that Defendant was acting as he normally did. She agreed that the investigator told her that it was more beneficial for Defendant if he was upset and that her testimony was that Defendant was, in fact, upset after leaving the victim's home.

Lauderdale said she took "a whole hand full" of the pills that Defendant brought from the victim's home. She did not know the exact amount of money that Defendant took from the victim's home but estimated that the amount was in the "[t]housands." She agreed that she told the investigator that Defendant took $20,000 from the victim's home. The group spent the money in just a few days by going to bars and clubs and purchasing a large amount of drugs and alcohol.

Lauderdale agreed that between the time that she initially spoke to investigators and her testimony at trial, her version of the number of trips they had taken to the victim's home, her stated purpose for going to the victim's home, what she recalled about the events, and what happened to the weapon had changed. She acknowledged that her murder charge likely would not be dismissed if she told the State that she did not remember the events or that she only went to the victim's home to purchase marijuana. She maintained that her testimony regarding the events was truthful "[t]o the best of [her] knowledge" and that her knowledge did not derive from the statements of the investigator or others.

On redirect examination, Lauderdale agreed that toward the end of the interview, she admitted to the investigator that the group went to the victim's home to commit a robbery, that Defendant took an item or tool into the house with him, and that Defendant returned with the tool. She clarified that her testimony regarding the timing in which the group arrived at the victim's home was based on the lighting outside and not on the actual time.

*Crime Scene Investigation*

KPD Investigator Tim Riddle and Investigator Jeremy Maupin investigated the victim's death. Investigator Riddle conducted the investigation at the crime scene, arriving at the victim's home around 4:15 p.m. on May 29, 2015. He observed no signs of forced entry at the front door. He entered the home and found the victim lying face down in a pool of blood on the living room floor in front of a couch. A large amount of blood was on top of the victim's head and on the floor, and the victim's hands were tucked underneath him. Investigator Riddle observed evidence of a struggle, including beer bottles turned over and paper scattered across the floor. He believed the victim's death was a homicide. He testified that the victim was in full rigor mortis, which suggested that the victim had been dead for several hours.

An officer rolled the victim over and searched his pockets, locating an identification card, a Kroger's card, a food stamp card belonging to Matthew Denton, some marijuana, a receipt from Kroger dated May 28th at 4:21 p.m., and $2,806 in cash. Some of the cash was secured by a band, and Investigator Riddle testified that "[a]pparently, [the victim] kept a lot of money in his home." He said, "I think the consensus was he kept a lot of

money in his home. He kept money on him, but there was money in that home as well." The victim was wearing cargo shorts, and the cash was found in multiple pockets. Investigator Riddle testified that the failure of the perpetrator to search the victim's pockets was indicative of someone who was "in a hurry" and failed to conduct a thorough search. He also stated that the victim, who was lying face down, was a "pretty good size guy," and that someone of smaller stature would have found it difficult to roll the victim over in order to search his pockets.

Investigator Riddle observed blood spatter or castoff on the walls and the ceiling in the living room. He explained that castoff results when a perpetrator strikes another with a blunt object multiple times, causing a victim's blood to transfer to the blunt object and then from the blunt object to the walls and ceiling as the blunt object continues in motion. A large area of blood was on the couch. Gray hair, matching the victim's hair color, along with blood and "goo," which Investigator Riddle believed to be castoff, was on a table near the bedroom door. The temperature inside the home was 68 to 70 degrees, which Investigator Riddle described as "pretty chilly" for that time of the year. An area of blood spatter was on the walkway outside the front door. Investigator Riddle testified that the blood could have dripped off the perpetrator's hand or the weapon used in the offense.

Investigator Riddle testified that the bedroom door appeared to have been kicked in or otherwise forced open with a shoulder. A hasp with a padlock had been above the door handle; the hasp was still connected to the door frame; and the padlock was still locked. The door handle had been knocked off the door, and officers located it under the bed. Officers entered the victim's bedroom and located a black bag to the left of the entry containing marijuana that had not yet been ground. Investigator Riddle testified that some of the dresser drawers were opened, which indicated that someone had been looking through the drawers. Officers located muscle relaxers inside some of the drawers and cash and a checkbook inside the bedroom. Investigator Riddle observed blood transfer on a sheet on the victim's bed where it appeared that someone who had blood on his or her person transferred that blood to the sheet. Officers located an open safe inside the bedroom that contained a large amount of marijuana. A total of three to four pounds of marijuana was found throughout the house, including in the safe, on top of the safe, and in a small bag in the bedroom. Officers located assorted pills or narcotics, including muscle relaxers, throughout the home and prescriptions issued to the victim. Investigator Riddle was unsure whether the perpetrator took any pills from the home and stated, "I don't know if—what all was taken, as far as drugs."

Officers located a dry-erase board inside the victim's bedroom that listed the first names of various individuals, along with dollar amounts. Officers later identified the full names of those listed on the dry-erase board, including Defendant, Mr. Branner, Mr. Nichols, Mr. Holder, Matthew Denton, Richard Denton, Mr. Childress, and Ms. Birdwell.

Officers collected the victim's cordless phone and cell phone, and Investigator Riddle reviewed the call log on the cordless phone and made notes. Officers also recovered a ledger and a handwritten call list, which Investigator Riddle believed listed the first names of all those with whom the victim dealt. Officers utilized the call list in identifying those who called the victim during the day of the victim's death.

*Investigation of John Nichols*

Investigator Maupin participated in 20 or more interviews in investigating the victim's death and conducted a neighborhood canvas. Investigator Riddle spoke to Melvin Ramsey, the victim's neighbor, who noted the amount of traffic that entered and exited the victim's home. However, the investigators were unable to locate an eyewitness who saw anything suspicious occur on the night of the victim's death.

Investigator Maupin stated that he interviewed Mr. Holder, who was the last person other than Defendant to see the victim alive. Investigator Maupin explained that because everyone had to be treated as a suspect until the investigators were able to eliminate them as suspects, he was "pretty hard" on Mr. Holder and attempted to "call him out" on his lies and inconsistencies. Mr. Holder remained "true to his statement," and the investigators released him following his interview because they did not believe he was the perpetrator. Investigator Maupin later spoke to Mr. Holder at his home and asked him to describe the clothing that the victim was wearing that night before Mr. Holder left the victim's home. Mr. Holder described the victim's black t-shirt and khaki shorts.

Investigator Maupin also interviewed Mr. Branner, who described the victim as an "old school drug dealer" or someone who "stays under the radar." Investigator Maupin learned that the victim only sold drugs to a close-knit group of family and friends and that the victim required that the person call before going to his home. Investigator Maupin determined that the perpetrator was someone the victim knew and stated that since he saw no evidence of forced entry into the home, he believed the victim allowed the perpetrator to enter the home. Investigator Maupin also learned that the victim generally had a large amount of money with him.

Investigator Maupin testified that Mr. Nichols became a person of interest after others reported that Mr. Nichols had a drug problem and had previously stolen from the victim. Mr. Branner testified at trial that when police officers asked him whether he knew of anyone who might have wanted to injure the victim, he responded, "John," which was John Nichols, although Mr. Branner was not aware of Mr. Nichols's last name at the time. Mr. Branner was aware that Mr. Nichols may have been the victim's son and that the victim treated him like a son. Mr. Branner stated, however, that the relationship between the victim and Mr. Nichols was not always friendly and that Mr. Nichols was a drug addict

- 11 -

who had previously stolen from the victim. Mr. Branner also stated that the victim remained close to Mr. Nichols even after Mr. Nichols had stolen from him. Mr. Holder likewise testified that he recalled one occasion during which Mr. Nichols took a television and DVDs from the victim, which the victim later retrieved from Mr. Nichols.

Within the first few days of the investigation, Investigator Maupin and Investigator Riddle located Mr. Nichols and his girlfriend at their home. The investigators informed Mr. Nichols that they discovered the victim injured in his home and asked Mr. Nichols to come with them to the police department for an interview. Investigator Riddle testified that Mr. Nichols asked him whether he believed a home invasion occurred, but Investigator Riddle did not believe he would have disclosed that a home invasion occurred at that point. Investigator Maupin explained that he and Investigator Riddle did not inform Mr. Nichols of the victim's death because they wanted to record Mr. Nichols's reaction when he heard the news and they did not want to give Mr. Nichols time to think of a statement in response to the news.

Mr. Nichols agreed to an interview, and investigators drove him to the police department where he waived his rights and agreed to speak to the investigators. The investigators placed Mr. Nichols in an interview room that had both audio and video recording equipment, and Mr. Nichols was alone in the room for a period of time. Investigator Riddle agreed that at that time, he had not yet told Mr. Nichols that a robbery had occurred, that the victim had been beaten "within an inch of his life," or that the victim had been killed.

Investigator Maupin testified that Mr. Nichols did not appear to be under the influence of drugs or alcohol and that he appeared to understand the investigators' questions. Investigator Maupin stated that Mr. Nichols was calm and concerned about the victim and that he tried to be cooperative. Mr. Nichols was not cooperative about his prior drug use, which Investigator Maupin said was not uncommon. Mr. Nichols shielded the fact that he had purchased drugs from the victim, and Investigator Maupin believed Mr. Nichols was shielding this information because he thought that the victim was still alive. Mr. Nichols eventually admitted to some marijuana use, agreed to submit to a buccal swab, and allowed the investigators to search his cell phone. Investigator Maupin testified that once he informed Mr. Nichols of the victim's death, Mr. Nichols appeared shocked, became upset, and cried different times throughout the interview. Mr. Nichols said that he believed he was the victim's biological son and that the victim had treated him like a son.

Investigator Maupin testified that he noticed that Mr. Nichols had scratches on his arms and that although many of the scratches appeared old, one scratch was "reddish" and appeared to be a fairly recent injury. Mr. Nichols reported that he worked in landscaping, which investigators were later able to confirm, and he explained that he sustained the

scratches while transporting debris and branches in a wheelbarrow. Mr. Nichols allowed the investigators to photograph the scratches.

Investigator Maupin obtained through a search warrant the cell tower location information for Mr. Nichols's cell phone from May 28 to the early morning house of May 29, 2015. Investigator Maupin testified that according to the records, Mr. Nichols was not around the victim's home during that period. Investigator Maupin stated that the records showed that Mr. Nichols remained at home on the night of May 28th except one time period during which he went to a location that was not close to the victim's home. The next morning, Mr. Nichols went to Blount County to complete a landscaping job.

On cross-examination, Investigator Maupin testified that Mr. Nichols's cell phone records showed that his last call on the night of the victim's homicide was at 7:27 p.m. and that Mr. Nichols did not receive another call until the next morning. Investigator Maupin agreed that the cell tower data did not show the location of Mr. Nichols's cell phone during the time period in which Investigator Maupin believed the victim was killed. Investigator Maupin also agreed that the cell tower data from Mr. Nichols's cell phone did not exclude Mr. Nichols as a suspect. Although officers obtained a buccal swab from Mr. Nichols, his DNA was never tested against the DNA obtained from the crime scene.

On redirect examination, the prosecutor asked Investigator Maupin how Mr. Nichols's demeanor during the interview affected the investigator's decision about Mr. Nichols's involvement in the victim's homicide. Investigator Maupin testified that he did not believe Mr. Nichols was involved "based on his body language and things he said" and explained that Mr. Nichols "was willing to come back [the following] Monday to do a polygraph, just wanted to clear his name and was really anxious for us to find the killer." On recross-examination, Investigator Maupin testified that a polygraph examination was never administered to Mr. Nichols. Investigator Maupin stated that although he was not allowed to testify regarding the results of a polygraph examination, he was not aware that he was prohibited from making any reference to a polygraph examination. The State conceded that polygraph evidence was not admissible.

*The Investigation into Defendant and the Co-Defendants*

Investigators obtained the victim's telephone records and call logs from the victim's telephone and researched the telephone numbers of those who called the victim on May 28, 2015. According to the records and logs, at around 6:27 or 6:28 p.m., on May 28th, the victim received a call from a number that Investigator Andrew Olson later determined belonged to Chelsea Lauderdale. Investigator Olson was able to match the number to Lauderdale's Facebook profile. He also researched the police records management system and found a report referencing Lauderdale and listing the same telephone number.

Investigator Maupin examined Lauderdale's Facebook page where she posted photographs of herself and three others at what appeared to be the local Greyhound bus station. She also posted photographs of the same group at a beach in Jacksonville, Florida. Investigator Maupin stated that "it was interesting to me the fact that you call our victim on the night that he was murdered, and now you're on a bus, and now you're at the beach." He made efforts to identify the three people who accompanied Lauderdale to Florida. He learned of someone named "DJ," who he determined was Defendant. Investigator Maupin used the photograph from Defendant's driver's license to positively identify him in the photographs on Lauderdale's Facebook page. Investigator Maupin employed a similar procedure in identifying Ward and Hill.

Investigator Maupin interviewed various family members of Defendant, Lauderdale, Ward, and Hill, including Ms. Baumann, Defendant's grandmother. When Investigator Maupin interviewed Ms. Baumann, he was unaware of her connection to the victim but later learned of the connection through his interviews with others. He noted that according to the victim's telephone records, Ms. Baumann called the victim three times on May 23rd and once on May 27th of 2015.

Once Investigator Maupin learned that Ward and Hill returned to Knoxville on a bus, he began "Facebook stalking" them. On June 10, 2015, Investigator Maupin located Ward at his residence, and Ward agreed to go to the police station for an interview. Ward waived his rights and agreed to submit a DNA sample. Investigator Maupin stated that although he obtained DNA samples from several individuals, testing by the Tennessee Bureau of Investigation ("TBI") only positively identified the victim's DNA at the scene. Officers searched Ward's car but found no traces of blood.

Based upon Investigator Maupin's interview with Ward, Investigator Maupin and other officers returned to the victim's home to search for a weapon used by Defendant upon entering the home. Officers searched the home and a field near the home for two days. One officer located and collected a piece of rebar in the field. Investigator Maupin showed the rebar to the medical examiner who performed the victim's autopsy, and she stated that the rebar could be the weapon. Investigator Maupin stated that the rebar was later determined to have no evidentiary value as there were no traces of blood on the rebar and it appeared that the rebar had been buried in the ground for some time. Officers were unable to locate the weapon, and Investigator Maupin stated that Ward "straight out lied about that weapon." Ward was arrested and charged with felony murder.

Investigator Maupin testified that while attempting to locate Hill, he received information that she had overdosed and was hospitalized. When he arrived at the hospital, Hill was unconscious, and he requested that a hold be placed on her and that he be notified

once she regained consciousness. However, medical personnel later released Hill from the hospital without first notifying Investigator Maupin. Investigator Maupin eventually located Hill and spoke to her. She was arrested and charged with felony murder. The charges against Hill and Ward were still pending at the time of Defendant's trial.

Investigator Maupin stated that he learned through family members that Defendant and Lauderdale were planning to go to Detroit, Michigan. Officers with the United States Marshall's Services and the Michigan State Police assisted in locating Lauderdale and Defendant at the home of Defendant's mother in Saginaw, Michigan. After officers took Lauderdale and Defendant into custody, Investigator Maupin and a KPD sergeant searched the home and collected clothing and documents. Investigator Maupin stated that he located a bus ticket from Jacksonville to Michigan, "corroborating the fact that they did flee from there." Defendant's mother informed officers that she had purchased bus tickets for Defendant and Lauderdale.

Investigator Maupin and a KPD sergeant interviewed Lauderdale on June 16, 2015, at the jail in Saginaw. Investigator Maupin advised her of her constitutional rights and stated that she did not appear to be under the influence of an intoxicant and that she appeared to understand his questions. She consented to providing a DNA sample and to a search of her cell phone, which was a new Samsung Galaxy S3. Investigator Maupin stated that the same type of cell phone also was recovered from Defendant. Investigator Maupin testified that during the interview, Lauderdale was "kind of relaxed" and that although she showed signs of nervousness, she had "like a[n] 'I don't care' attitude," and that she "kind of giggled a lot" and "made light of things." Investigator Maupin said Lauderdale "was proven to be a liar from the first part of the interview. She was giving me information that I didn't believe was true." During the interview, her demeanor changed, and she became more serious.

After interviewing Lauderdale, Investigator Maupin and the sergeant interviewed Defendant. Although the interview room had video recording equipment, the audio recording equipment was not functional at the time. Investigator Maupin used his cell phone's audio recorder to record the interview. He advised Defendant of his rights, and Defendant signed the form waiving those rights. Investigator Maupin stated that Defendant did not appear to be intoxicated and appeared to understand the questions. Investigator Maupin testified that Defendant "came in kind of hostile," and was "a little angry, very rude," and "[v]ery argumentative."

The audio recording of the 22-minute and 35-second interview, during which Defendant went on multiple rants littered with cursing, was played for the jury. Investigator Maupin informed Defendant that he had been charged with first degree murder and advised him of his rights, and Defendant waived his rights and agreed to speak to

Investigator Maupin. Defendant asked, "[W]ho did I supposedly kill? And about what day did I kill them on?" Investigator Maupin asked him when he left the state, and Defendant replied that he was "here" as of May 26th "because I ain't gonna lie, I smoke weed. Let's keep it 100." Defendant asked whether the officers were there about the victim. Investigator Maupin confirmed that they were, and Defendant responded that the victim was a family friend and was like a father to him. Defendant stated that the victim sold marijuana to him and that he had last purchased marijuana from the victim on May 26th. Defendant said he had to call his grandmother "to get his weed cleared through this man. Otherwise, there is not point in stopping over 'cause he's not going to answer the f***ing door."

Defendant told the investigator that on May 26th, Ward drove Defendant and his girlfriend to Savannah, Georgia, where Defendant was paid to work on a car for someone. Defendant said that he and Lauderdale returned to Knoxville on the morning of May 29th, that he retrieved his clothing and other belongings from his grandmother's home and a friend's home, and that he and Lauderdale purchased cell phones from Walmart. He said that on the night of May 29th, he rode a bus to Jacksonville, Florida. He stated that his mother later called him and told him that she had purchased a home in Michigan that she did not like, that Defendant could have the house, and that she would purchase another house for herself. She then purchased a bus ticket to Michigan for Defendant.

When Investigator Maupin mentioned May 28th, Defendant interrupted and stated that his grandmother told him that on May 28th, the victim was beaten in the head and brutally murdered. Defendant asked why he was being charged for the victim's "f***ing murder." Investigator Maupin responded that he had spoken to the co-defendants and that he knew that Defendant went with them to the victim's home in Ward's car to commit a robbery and that Defendant owed the victim money. Defendant denied that he owed money to the victim. Investigator Maupin stated that he knew that Defendant entered the victim's house alone while armed with a tool. Investigator Maupin told Defendant that he believed "things went south" and an accident occurred.

Defendant requested an attorney, and Investigator Maupin responded, "Okay." Without any further questioning or prompting by Investigator Maupin, Defendant continued with a statement "hypothetically" and "off the record" because he would "deny ever saying this." He stated, "Let's hypothetically say that man had been cracked out of his mind or on some type of drugs that I'm not sure of." He continued, "And let's just say when I asked that man to loan me the $100 I showed up over there to pick up . . . that man drew weapons." Defendant stated, "I'm pretty sure we can put the rest of the f***ing story together here. . . . I'm not going no further because technically that's . . . even through I'm sitting here saying this off the record this never f***ing happened." Defendant maintained that he would never injure "that man" and that Ward and Hill were known as "junkies,"

- 16 -

and he laughed.  He continued by stating that a "junkie" would not be allowed to testify because the "junkie" can be "knocked off as far as credit."  He stated the only other two people left were he and his girlfriend, both of whom maintained that they were not in Tennessee when the victim was killed.

Investigator Maupin told Defendant that he could not ask Defendant any additional questions since Defendant requested counsel.  Defendant affirmed that he wanted an attorney because "this is bulls**t.  It ain't because I'm guilty."  Defendant asked whether the death penalty was available in Tennessee.  When the sergeant responded in the affirmative, Defendant asked, "How are they doing it now?  Lethal injection or still old sparky?"  The sergeant can be heard in the recording calling someone and stating that they were ready to leave.  However, Defendant continued talking, stating that he knew a recording device was in the room, and the sergeant told him that the device was "right there."  Defendant told the officers that they wasted their time coming to the area.  Investigator Maupin replied that it was worth Defendant's being arrested and going to prison for the rest of his life.  Defendant asked whether the officers were relying upon the statements of "junkies" and a "strung out robbery boy."  He stated that "hearsay" would not "hold up in court," especially when the evidence would show that he was in another state when the victim was killed.

One of the officers can be heard in the recording taking photographs, and two photographs of Defendant taken during the interview were entered as exhibits as trial.  In both photographs, Defendant is sitting in a chair with his legs stretched out.  One photograph shows Defendant with each arm stretched across an adjoining chair, and the other photograph depicts Defendant smiling while holding both of his thumbs up.

When Defendant noted that the officers were still recording, he stated,

> This is for all of Knoxville . . . f*** y'alls county.  That's all I got to say . . . f*** Knoxville. . . . F*** it.  I'm already going to jail so I might as well have fun at it. . . .  At least I get to Knoxville and beat this bulls**t a** case. . . . And if I don't then Knoxville officially got their f***ing wish.  They got to put another mother f***ing Hickman behind bars.

Investigator Maupin said that when "we do that," it would not bring the victim back, and Defendant maintained that he did not kill the victim.  Defendant continued by stating that the co-defendants could say "what the f*** [they] want" and that "I really don't give two flying f***s.  I didn't do the f***ing crime.  That's all there is to it. . . .  And unless they got more than just hearsay[,] as far as f***ing evidence[,] they can shove that s**t up they a** anyway."  Defendant made disparaging statements about the Knox County judicial system and the KPD.  He stated that even if he went to prison, he would file "appeal after

- 17 -

appeal." He also stated that if he had a choice between life in prison and the death penalty, he would choose the death penalty and that he hoped "it's old sparky too."

Defendant asked Investigator Maupin if he was recording the interview on his personal cell phone, and Investigator Maupin responded that he was using his work cell phone. Defendant stated that Investigator Maupin likely took his work cell phone home with him, and Investigator Maupin said he also took his cell phone to Michigan. Defendant went on another rant, stating in part,

> I'm pretty sure you could [take] that motherf***** to bumf*** Egypt too. Or y'all could probably, definitely take it to I just really don't give a f***. Followed by two cups of really don't give a f***. So the more you record me, probably the worst I'm fixing to get. So the more you keep me on camera, the more I'm fixing to for real show my a**. . . . Y'all definitely have a reason to be charging me for something then. 'Cause I'm gonna flip all these g*****n tables over. I'm gonna flip this f***ing room upside down before these police can get in here.

Defendant stated that if the recording of the interview "comes up in the evidence," he is going to "f***ing roll right there in the courtroom" and "hit the f***ing floor laughing."

An unidentified person is heard asking whether the officers were still in the interview room, and the sergeant responded that they were ready to leave. Defendant continued maintaining that he did not kill the victim and that they would be in court "every f***ing day . . . every f***ing month . . . every f***ing year. This will be a repeated f***ing process." When Investigator Maupin stated that the officers were paid by the hour, Defendant said, "I don't get paid regardless, so either way I just don't give a f***." He then made several remarks about the condition of the jails in Knox County. He told an unidentified person to return him to his cell. The person told Defendant that he hoped Defendant was not "giving them a problem," and Defendant replied, "Oh God no. If that's giving them trouble. . . ."

Officers also obtained a recording of a call between Defendant and his grandmother made on December 23, 2016, while Defendant was in jail, and the recording was played for the jury. Defendant told his grandmother that he read the statements given by the co-defendants and that Lauderdale "threw [him] under the bus worse than all of them." Defendant stated that he was "not going down" for the victim's homicide. He asked his grandmother to contact his attorney and the investigators and to tell them that he is willing to make a deal and state what occurred. He maintained that he was not involved but that he knew what was occurring. He also maintained that he did not kill the victim and that

- 18 -

when he left the victim's home, the victim was shooting at him and cursing him. Defendant stated that although he "did do some other s**t," he did not kill the victim.

Investigator Maupin made efforts to corroborate the information provided by Lauderdale during her interview. He stated that officers were able to corroborate that Defendant and the co-defendants knew each other, that they were at Mr. Smith's apartment; that none of them had any money at that time, that they left in Ward's black Honda, that Defendant had previously purchased drugs from the victim, and that Defendant knew the victim through his grandmother. Investigator Maupin said Lauderdale admitted that the telephone number that appeared in the victim's telephone records and was linked to her Facebook account belonged to her.

Investigator Maupin testified that Lauderdale informed him that the group went to the victim's home around dusk or sunset, and Investigator Maupin's research revealed that the historical sunset for May 28, 2015, was 8:44 p.m. He noted that based on the information taken from the victim's telephones and obtained from telephone records, the victim did not make any calls or answer anyone who called him after 8:00 p.m. When the victim was found, he was still wearing the clothes that he had been wearing when Mr. Holder was at his home. The blood around the victim had darkened and hardened, and the victim's body was cold and stiff, which Investigator Maupin believed established that the victim was in the later stages of rigor mortis.

Investigator Maupin stated that he learned through the interviews of co-defendants and others that a tool was involved and that Defendant returned with the tool when leaving the victim's home. Investigator Maupin said that Lauderdale's testimony regarding the description of the tool was consistent with the description that she provided in her statement. Investigator Maupin noted that Lauderdale stated that blood was on Defendant's hand and that "we can agree with that for the fact that the crime had a lot of castoff. So there was probably gonna be some blood on . . . the suspect." Investigator Maupin corroborated Lauderdale's statement that approximately $20,000 was taken from the victim's home "through another codefendant's testimony" and that the group had money upon returning to Mr. Smith's apartment. Investigator Maupin stated that the cell tower information for Lauderdale's cell phone showed that she was in the eastern area of Knox County where she stated the tool used by the Defendant was discarded. Investigator Maupin later learned through the prosecutor and Lauderdale's attorney that Lauderdale was willing to show investigators the location where Defendant and Ward discarded the weapon. She directed investigators to Seven Islands Bird State Park located in east Knox County, but the investigators did not recover the weapon.

Officers went to the Greyhound bus station in Knoxville to verify that the photographs of the bus station posted on Lauderdale's Facebook page were from that

particular bus station. Officers secured video recording from the bus station and had photographic still shots made from the video. The still shots showed the group at the bus station in Knoxville on May 29th at 10:58 a.m.

Investigator Maupin was able to corroborate Lauderdale's statement regarding the group's trip to Florida. Through "a couple of their statements," he identified the motel where the group stayed as the InTown Suites. He called the manager, who confirmed that the group had been at the motel. The manager reported that the group had been kicked out of the motel room and that any of their belongings remaining in the room had been discarded. Investigator Maupin obtained a copy of the motel bill from the manager. According to the bill, the group arrived on May 30th and paid for the room through June 6th. The room was registered under Ward's name, and the additional guests were listed as Defendant, Lauderdale, and the stripper who returned with Defendant and Lauderdale one night.

Investigator Maupin recalled Lauderdale telling him about Defendant's throwing a wallet to Ward in the front seat of Ward's car. Investigator Maupin later received a call from the victim's brother-in-law about an envelope that had been mailed to the victim but did not include a return address. The envelope contained the victim's driver's license, a credit card, and various medical and insurance cards, all of which are generally stored in a wallet. Investigator Maupin was not able to determine where those items had been discarded.

Investigator Maupin obtained Lauderdale's cell phone records and cell tower records showing the cell towers utilized by the cell phone on the day of the offenses. He acknowledged that the cell tower records only showed a general area where the cell phone was located. He noted that during the periods in which Lauderdale maintained she was at Mr. Smith's apartment, her cell phone was utilizing a cell tower in South Knoxville where his apartment was not located, but Investigator Maupin explained that based upon his prior experience investigating crimes in that area, this was the cell tower generally utilized by cell phones in the area of Mr. Smith's apartment. Investigator Maupin stated that the cell tower information showed movement of Lauderdale's cell phone after the call to the victim. At 9:18 p.m. on May 28th, her cell phone utilized a cell tower near the Midway exit on the interstate outside of Knox County. Investigator Maupin explained that when Lauderdale was showing him the location where the weapon was discarded, she acknowledged that the Midway exit was one path that could be used to reach the area. Lauderdale's cell phone utilized a cell tower moving back toward Knoxville at around 9:30 p.m. and a cell tower around Mr. Smith's apartment at 10:12 p.m. Her cell phone then utilized cell towers in the area of the bus station and Walmart.

Timothy Allison, Lauderdale's brother who also grew up with Ward and Defendant, testified that on May 27, 2015, he and Mr. Ward were installing a motor into a black Honda Accord with "green striping" on the hood and green wheels, which Ward had recently purchased. On the following day, they were going to a store in Ward's car when Ward received a call from Defendant. After the call ended, Mr. Allison told Ward that he was "dumb if he went and got him." Mr. Allison explained that he knew Defendant and that "[h]e's crazy." After Mr. Allison and Ward returned from a store, Mr. Allison went to another location to repair a car, and he then did not see Ward and Lauderdale for a period of time. Mr. Allison recalled that at some point, Lauderdale called him, stated that she was in Florida and wanted to return to Knoxville, and requested money. Mr. Allison told her that he did not have any money.

Cody Smith, Lauderdale's cousin, testified that on May 28, 2015, he allowed Lauderdale to stay at his apartment. Lauderdale was with Defendant, who Mr. Smith overheard stating that he needed to make money to take care of Lauderdale. Later that evening, Defendant and the co-defendants left in Ward's black Honda car, and they returned later that night while Mr. Smith was sleeping on his couch. Mr. Smith stated that Lauderdale gave him two one-hundred dollar bills. The group asked Mr. Smith about the price of a Greyhound bus ticket to Florida, and Mr. Smith told them that he did not know. Defendant and the co-defendants then left the apartment.

Dr. Darinka Mileusnic-Polchan, an expert in forensic and anatomic pathology, testified regarding the autopsy of the victim conducted by Dr. Amy Hawes, who was unavailable to testify at trial. Dr. Mileusnic-Polchan reviewed the autopsy report, photographs, and the scene investigation where investigators with the forensic center went to the crime scene to obtain information relevant to the autopsy. She testified that the victim's cause of death was due to blunt force trauma to his head, resulting in cranial cerebral injuries where his skull was fractured and his brain was injured.

Dr. Mileusnic-Polchan noted a cluster of six lacerations, representing at least six different strikes to the victim's head. She stated that some of the lacerations were "branching" or "split more," which could indicate that the victim was struck more than once in the same location. She stated that, thus, the victim could have sustained more than six blows to his head. The victim sustained one frontal head injury, but the majority of the injuries were located above his left ear and toward the back of his head. Dr. Mileusnic-Polchan noted areas of deep linear lacerations surrounded by abrasions and testified that the object used to inflict the blows was narrow, elongated, and heavy. She also noted two distinct circular fractures, which indicated that the object used also had a rounded end.

Dr. Mileusnic-Polchan testified that blood staining was on the victim's shirt and shorts with a small amount on his socks and shoes. While some blood stains were on the left side of the victim's shorts, the majority of the blood stains were on the front of his shorts around the groin area. Dr. Mileusnic-Polchan stated that the distribution of the blood in the groin area of the shorts was in a "triangular fashion," which indicated that the victim was likely sitting when the bleeding began. She also stated that the blood staining on the couch was consistent with the victim's being attacked while in a seated position and then sliding or falling onto the floor. She did not note many defensive injuries, explaining that the victim had two minor scratches which may have occurred when the victim collapsed from the sitting position on the couch to the floor.

Dr. Mileusnic-Polchan testified that the victim was 61 years old, was five feet, nine inches tall, and weighed 231 pounds. He suffered from diabetes and hypertension. According to the toxicology results, he had a small amount of marijuana in his system.

Dr. Mileusnic-Polchan estimated the victim's time of death as between 8:00 and 10:00 p.m. on May 28, 2015. She stated that the victim had lividity on the front of his body, which was consistent with his lying facedown for some time. Once the victim was rolled over, some of the lividity remained in that most of the blood stayed at the front of the victim's body, and this continued lividity meant that the victim had been lying facedown in the same position for 12 to 24 hours. The victim's body was refrigerated at the medical examiner's office between 7:30 and 8:00 p.m. on May 29th, which slowed the changes to the victim's body. At the time of refrigeration, the victim's body showed signs of epidermal skin slippage where the skin on the front of his body had begun to detach or peel. Dr. Mileusnic-Polchan stated that fixed lividity and skin slippage do not occur prior to 24 hours after death unless the body is exposed to extreme temperatures. She said that if the room temperature where the victim died was between 68 and 72 degrees, lividity and skin slippage would never occur prior to 24 hours of death. At the time of the autopsy on the morning of May 30th, the victim was in full rigidity, which begins dissolving between 36 to 48 hours after death.

On cross-examination, Dr. Mileusnic-Polchan testified that weight and diabetes, which result in circulation issues, could affect the rate of lividity and the time in which it becomes fixed. She agreed that she focused more on skin slippage and lividity rather than the condition of the internal organs in determining the time of death, explaining that using the condition of the internal organs to determine the time of death is especially unreliable in adults. She acknowledged that the victim could have died "a couple of hours" prior to 8:00 or 9:00 p.m. on May 28th. She explained that although "none of this is really precise," "the skin slippage at room temperature will never happen in less than 24 hours, period," unless the victim was severely septic, which he was not. She estimated that the victim would have died at 8:00 p.m. on May 28th for the skin slippage to have occurred but that

information from anyone who was with the victim from 6:00 to 10:00 p.m. would be helpful to her determination.

On redirect examination, Dr. Mileusnic-Polchan agreed that based upon the postmortem changes to the victim's body, the time of death fell within the window of 8:00 to 10:00 p.m. on May 28th. She testified that the victim would not have been able to speak to his assailant after receiving the head injuries. She stated that the victim would have lost consciousness, but death would not have been instantaneous.

*Defense Proof*

Christy Birdwell testified that she attended a cookout at the victim's home on Memorial Day prior to the victim's death. She recalled that Mr. Nichols and his girlfriend also attended the cookout and that Mr. Nichols became angry when he misplaced a pill. Ms. Birdwell stated that whenever Mr. Nichols and his girlfriend went to the victim's home, the victim locked his bedroom door and that the victim "kept it locked at all times." The victim also placed his small dog in another room because Mr. Nichols's girlfriend did not like the dog jumping on her.

Kenneth Childress, a friend of the victim, testified that when women, such as Mr. Nichols's girlfriend, came to the victim's home, the victim would place his small dog in another room and tell Mr. Childress that women did not like the dog jumping on them. The victim also locked his bedroom door on some occasions when people came to his home.

Mr. Melvin Ramsey, the victim's neighbor, testified that he told a police officer that on the morning prior to the discovery of the victim's body, he saw the victim standing inside the front doorway of the victim's home. Mr. Ramsey stated that he was no longer certain that he saw the victim that morning.

The defense also presented testimony from a forensic scientist with the TBI that only the victim's DNA was found at the scene and that no blood was found in Ward's car. At the conclusion of the proof, the jury convicted Defendant of criminally negligent homicide as a lesser included offense of felony murder and especially aggravated robbery as charged in the indictment. Following a sentencing hearing, the trial court imposed consecutive sentences of two years for criminally negligent homicide and 25 years for especially aggravated robbery, for an effective sentence of 27 years. Defendant filed a motion for new trial, which the trial court denied following a hearing. Defendant then filed a timely notice of appeal.

*Analysis*

- 23 -

Defendant contends that (1) the evidence is insufficient to support his convictions; (2) the trial court erred in excluding evidence supporting the defense theory that a third party committed the offenses in violation of Defendant's right to present a defense; (3) the trial court erred in admitting the entire audio recording of Defendant's interview with police and photographs taken of Defendant during the interview; (4) the trial court erred in admitting testimony regarding a prior suspect's willingness to take a polygraph examination; (5) the jury improperly considered a lesser included offense for especially aggravated robbery in violation of the trial court's sequential jury instructions; and (6) the cumulative effect of the errors deprived Defendant of his right to a fair trial.

*Sufficiency of the Evidence*

Defendant challenges the sufficiency of the evidence supporting his convictions. Specifically, he argues that the evidence was insufficient to corroborate the testimony of Lauderdale as an accomplice. The State responds that the evidence is sufficient to support Defendant's convictions. We agree with the State.

Our standard for reviewing the sufficiency of the evidence, both direct and circumstantial, is limited. *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011). We must afford the State "the strongest legitimate view of the evidence and all reasonable inferences that may be drawn therefrom." *State v. Vasques*, 221 S.W.3d 514, 521 (Tenn. 2007) (citing *State v. Cabbage*, 571 S.W.2d 832, 835 (Tenn. 1978)). The determinative question is whether, after reviewing the evidence in the light most favorable to the State, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *see also* Tenn. R. App. P. 13(e). "Because a verdict of guilt removes the presumption of innocence and raises a presumption of guilt, the criminal defendant bears the burden on appeal of showing that the evidence was legally insufficient to sustain a guilty verdict." *State v. Hanson*, 279 S.W.3d 265, 275 (Tenn. 2009) (citing *State v. Evans*, 838 S.W.2d 185, 191 (Tenn. 1992)). Although we review de novo the application of the law to the facts, *Jordan v. Knox Cnty.*, 213 S.W.3d 751, 763 (Tenn. 2007) (citing *State v. Thacker*, 164 S.W.3d 208, 247-48 (Tenn. 2005)), we cannot substitute our own inferences for those drawn by the factfinders at trial, *State v. Lewter*, 313 S.W.3d 745, 747-48 (Tenn. 2010). Instead, it is the trier of fact, not this Court, who resolves any questions concerning "the credibility of witnesses, the weight and value to be given the evidence, as well as all factual issues raised by the evidence." *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997).

Criminally negligent homicide is defined as "[c]riminally negligent conduct that results in death." T.C.A. § 39-13-212(a); *see State v. Farner*, 66 S.W.3d 188, 199 (Tenn. 2001). Pursuant to Tennessee Code Annotated section 39-13-106(a)(5),

"[c]riminal negligence" refers to a person who acts with criminal negligence with respect to the circumstances surrounding that person's conduct or the result of that conduct when the person ought to be aware of a substantial and unjustifiable risk that the circumstances exist or the result will occur. The risk must be of such a nature and degree that the failure to perceive it constitutes a gross deviation from the standard of care that an ordinary person would exercise under all the circumstances as viewed from the accused person's standpoint[.]

T.C.A. § 39-13-106(a)(5).

Especially aggravated robbery is a robbery that is accomplished with a deadly weapon and where the victim suffers serious bodily injury. T.C.A. § 39-13-403(a). Robbery is defined as "the intentional or knowing theft of property from the person of another by violence or putting the person in fear." T.C.A. § 39-13-401(a). "A person commits theft of property if, with intent to deprive the owner of property, the person knowingly obtains or exercises control over the property without the owner's effective consent." T.C.A. § 39-14-103(a).

When the only proof of a crime is the uncorroborated testimony of one or more accomplices, the evidence is insufficient to sustain a conviction as a matter of law. *State v. Collier*, 411 S.W.3d 886, 894 (Tenn. 2013) (citing *State v. Little*, 402 S.W.3d 202, 211-12 (Tenn. 2013)). The Tennessee Supreme Court has defined the term "accomplice" to mean "one who knowingly, voluntarily, and with common intent with the principal unites in the commission of a crime." *Id*. (citing *State v. Bough*, 152 S.W.3d 453, 464 (Tenn. 2004); *Clapp v. State*, 30 S.W. 214, 216 (Tenn. 1895)). The test for whether a witness qualifies as an accomplice is "'whether the alleged accomplice could be indicted for the same offense charged against the defendant.'" *Id*. (quoting *Monts v. State*, 214 Tenn. 171, 379 S.W.2d 34, 43 (1964)). Here, there is no dispute that Lauderdale was an accomplice as she was indicted for the same offenses charged against Defendant. The trial court instructed the jury that Lauderdale was an accomplice whose testimony must be corroborated.

Our supreme court has described what is required to establish sufficient corroboration as follows:

[T]here must be some fact testified to, entirely independent of the accomplice's testimony, which, taken by itself, leads to the inference, not only that a crime has been committed, but also that the defendant is implicated in it; and this independent corroborative testimony must also

include some fact establishing the defendant's identity. This corroborative evidence may be direct or entirely circumstantial, and it need not be adequate, in and of itself, to support a conviction; it is sufficient to meet the requirements of the rule if it fairly and legitimately tends to connect the defendant with the commission of the crime charged. It is not necessary that the corroboration extend to every part of the accomplice's evidence.

*State v. Shaw*, 37 S.W.3d 900, 903 (Tenn. 2001) (quoting *Bigbee*, 885 S.W.2d at 803). The corroborative evidence need not be "overwhelming." *Id*. In fact, "[o]nly slight circumstances are required to corroborate an accomplice's testimony." *State v. Griffis*, 964 S.W.2d 577, 589 (Tenn. Crim. App. 1997) (internal citations omitted). Whether sufficient corroboration exists is for the jury to determine. *Shaw*, 37 S.W.3d at 903.

We conclude that Lauderdale's testimony was sufficiently corroborated by other evidence presented at trial, including Defendant's own statements. *See, e.g. State v. Quantavious Williams*, No. E2019-02266-CCA-R3-CD, 2021 WL 1263987, at *7 (Tenn. Crim. App. Apr. 6, 2021), *no perm. app. filed* (holding that the accomplice's testimony was "sufficiently corroborated by other evidence in the record, including the defendant's own statement"); *State v. Pack*, 421 S.W.3d 629, 645 (Tenn. Crim. App. 2013) (concluding that the physical evidence "coupled by the defendant's statement to police" corroborated the accomplice's testimony). Evidence independent of Lauderdale's testimony established that Defendant knew the victim through Defendant's grandmother. Multiple witnesses testified to seeing Defendant at the victim's home on prior occasions, and Defendant acknowledged purchasing drugs from the victim. The State presented evidence that the victim was known to maintain a large amount of cash in his home and that he regularly loaned money to others. Defendant's name was on a list maintained by the victim of those who owed him money.

Mr. Smith, like Lauderdale, testified that Defendant and the three co-defendants were at Mr. Smith's apartment on May 28th. Mr. Smith overheard Defendant stating that he had to find a way to make money to take care of Lauderdale, which corroborated Lauderdale's testimony that they discussed ways to make money to purchase drugs and served as evidence that Defendant needed money before the robbery. Lauderdale's cell phone records showed that at around 6:27 or 6:28 p.m., her cell phone was used to call the victim and that the cell phone utilized a cell tower near Mr. Smith's apartment corroborated Lauderdale's testimony that Defendant called the victim using her cell phone. Consistent with Lauderdale's testimony, Mr. Smith said he later saw Defendant and the co-defendants leave in Ward's car.

Lauderdale testified that she, Defendant, Ward, and Hill arrived at the victim's home around dusk. The State corroborated this testimony through evidence that sunset occurred

at 8:44 p.m., and through Dr. Mileusnic-Polchan's testimony that the victim died between 8:00 and 10:00 p.m. Lauderdale testified that Defendant went to the victim's door while the co-defendants remained in Ward's car, that he knocked on the door, and that he was allowed inside. The State presented evidence that the victim sold drugs only to a select group of customers who he knew and that those customers generally were required to call before coming to his home. Defendant told the officers that the victim would not come to the door otherwise. There were no signs of forced entry at the front door, and Defendant admitted to his grandmother that he entered the victim's home. Lauderdale's description of the tool that Defendant took inside the victim's home was consistent with Dr. Mileusnic-Polchan's testimony regarding the description of the murder weapon.

Lauderdale testified that Defendant returned from the victim's home with pills and money. The State presented evidence that the victim was known to have pills and cash in his residence, that the door to the victim's bedroom was forced open, that the bedroom appeared to have been searched, and that the only significant amount of money found in the house was in the victim's pockets, which Investigator Riddle testified would have been difficult to search given the victim's size and the position of his body. Lauderdale testified that some of the money that Defendant obtained was secured in small black bands, and the State presented evidence that some of the money in the victim's pockets also was secured with a black band.

Although Mr. Smith overheard Defendant state prior to the commission of the offenses that he needed money to care for Lauderdale, the State presented independent evidence that Defendant and the co-defendants were in possession of money after leaving the victim's home and had begun spending it. Mr. Smith testified that when Defendant and the co-defendants returned to the apartment, Lauderdale gave Mr. Smith money, and they asked him about the price of bus tickets to Florida. Lauderdale's testimony that Defendant and the co-defendants went to Walmart where she and Defendant used the victim's money to purchase various items, including two Samsung cell phones, was corroborated by evidence that officers seized the Samsung cell phones when they arrested Lauderdale and Defendant and Defendant's statement acknowledging that he and Lauderdale had purchased the cell phones from Walmart. The cell tower information for Lauderdale's cell phone supported Lauderdale's testimony regarding the various places that Defendant and the co-defendants visited after leaving the victim's home. Officers obtained surveillance video showing Defendant and the co-defendants at the bus station, and Lauderdale posted photographs on Facebook of them at the bus station and in Florida. Investigator Maupin spoke to the manager of the motel where Defendant and the co-defendants stayed in Florida and obtained documents from the manager, confirming the date of their arrival.

In Defendant's brief, he identifies evidence that he maintains is inconsistent with Lauderdale's testimony, including the officers' failure to locate the murder weapon, the

lack of DNA evidence connecting Defendant and the co-defendants to the crime scene, Mr. Holder's testimony regarding the time during which Defendant was at the victim's home on the night of the offenses, and Mr. Ramsey's statement to the police about seeing the victim standing in his doorway on the morning prior to the discovery of the victim's body. Defendant essentially argues that such evidence is more credible and is entitled to greater weight than the evidence corroborating Lauderdale's testimony. However, the jury, and not this Court, resolves questions of credibility and the weight and value to be given to the evidence. *See Bland*, 958 S.W.2d at 659. Rather, we conclude that the evidence, when viewed in a light most favorable to the State and independent of Lauderdale's testimony, led to the inference that the offenses were committed and Defendant was implicated in their commission. Accordingly, Lauderdale's testimony was sufficiently corroborated by other evidence presented at trial.

*Right to Present a Defense*

Defendant maintains that the trial court erred in excluding evidence supporting the defense theory that Mr. Nichols was the perpetrator in violation of Defendant's right to present a defense. The State responds that the trial court's rulings did not violate Defendant's right to present a defense. We agree with the State.

During the cross-examination of the two investigators, defense counsel sought to introduce video footage of Mr. Nichols's call to an unidentified person while alone in the interview room prior to his interview with the investigators. During the call, Mr. Nichols stated, "Hi. . . . What do you mean? . . . Sit down and calm down. . . . Worried about what? . . . Somebody, I guess, either robbed him or I don't know what and they beat the f*** out of him to within an inch of his life. . . . Calm down. He's alright, and it's not even affecting you." Defense counsel argued that the recording was evidence that Mr. Nichols was aware of details regarding the attack on the victim prior to the investigators' disclosing it to him. The trial court found that the evidence was relevant and did not constitute hearsay because defense counsel was not seeking to admit the evidence for the truth of the matter asserted but as proof of Mr. Nichols's knowledge. The trial court ruled that the evidence was admissible. However, the trial court stated that if defense counsel admitted the portion of the recording, the State would be allowed to introduce other portions of the recording to show where Mr. Nichols may have gained the information. The trial court noted that when the investigators went to Mr. Nichols's home, they made statements to him that the victim had been beaten. The trial court also noted that Mr. Nichols made statements throughout the interview indicating that he was unaware of what occurred and noted his reaction when the investigators informed him of the victim's death.

During a subsequent jury-out hearing, defense counsel again argued that the portion of the recording was relevant and did not constitute hearsay. The trial court agreed that the

portion of the recording was not hearsay and stated, "I'm just saying that it opens the door for other things, if you do." Defense counsel responded, "And I think that's correct as well, your Honor. So I think as a tactical matter I will not be seeking to introduce that through cross."

Defendant also sought to introduce through the cross-examination of the investigators photographs of Mr. Nichols's cell phone showing a text message exchange between Mr. Nichols and "D. Rex" on May 30, 2015. According to the photographs, "D. Rex" sent Mr. Nichols a text message on May 30th at 4:49 p.m. stating, "Hydro 10s." Mr. Nichols responded, "Hell no." "D. Rex" then stated, "Help me get rid of [them]." Defendant also sought to introduce the portion of the recorded interview during which the investigators questioned Mr. Nichols about the exchange. Defense counsel noted that evidence had been presented that Mr. Nichols was a drug addict and argued that the text message exchange in which Mr. Nichols declined pills could indicate that he was "pill rich" in the days following the offenses against the victim, thus, suggesting that Mr. Nichols obtained the victim's pill supply. Defense counsel argued that even if the text message exchange constituted hearsay, the evidence was critical to the defense such that exclusion of the evidence would violate Defendant's right to present a defense. The trial court concluded that the text message exchange constituted hearsay and that exclusion of the evidence would not violate Defendant's right to present a defense. The trial court found that while the text messages had sufficient indicia of reliability, the evidence was not critical to the defense due to the existence of other evidence establishing that Mr. Nichols was using pills during that time period.

The Sixth Amendment and the Due Process Clause of the Fourteenth Amendment of the United States Constitution guarantee a criminal defendant the right to present a defense. *State v. Brown*, 29 S.W.3d 427, 432 (Tenn. 2000). However, in many situations, the defendant's due process right "'must yield to other legitimate interests in the criminal trial process.'" *Id.* at 432 (quoting *Chambers v. Mississippi*, 410 U.S. 284, 295 (1973)). "So long as the rules of procedure and evidence are not applied arbitrarily or disproportionately to defeat the purposes they are designed to serve, these rules do not violate a defendant's right to present a defense." *State v. Flood*, 219 S.W.3d 307, 316 (Tenn. 2007). To determine whether a defendant's due process right to present a defense has been violated by the exclusion of evidence, we must consider:

(1) Whether the excluded evidence is critical to the defense;
(2) Whether the evidence bears sufficient indicia of reliability; and
(3) Whether the interest supporting exclusion of the evidence is substantially important.

*Id.* at 316 (citing *Brown*, 29 S.W.3d at 434-35; *State v. Rice*, 184 S.W.3d 646, 673 (Tenn. 2006); *State v. Rogers*, 188 S.W.3d 593, 614 (Tenn. 2006)).

We note that the trial court did not exclude the recording of Mr. Nichols's cell phone call but merely warned defense counsel that the admission of the evidence would open the door to allow the State to present other evidence to explain how Mr. Nichols learned of some of the details of the attack and to establish that he was unaware of the victim's death. *See State v. Vance*, 596 S.W.3d 229, 249 (Tenn. 2020) (explaining that a party "opens the door" to evidence by introducing evidence or taking an action that "makes admissible evidence that would have previously been inadmissible") (citations omitted). Defense counsel conceded that the trial court's ruling was correct and made a strategic decision against presenting the evidence. On appeal, Defendant does not assert that the trial court's ruling is a misapplication of the opening the door doctrine but argues that the trial court's ruling violated his right to present a defense. However, defense counsel's strategic decision to forgo introducing the recording of Mr. Nichols's call in order to avoid opening the door to more damaging evidence did not violate Defendant's right to present a defense. *See State v. Jerry Carter, Sr.*, No. W2020-00478-CCA-R3-CD, 2021 WL 4811943, at \*19 (Tenn. Crim. App. Oct. 10, 2021), *perm. app. denied* (Tenn. Feb. 9, 2022) (holding that defense counsel's strategic decision against questioning a witness on a particular topic in order to avoid opening the door to the presentation of more damaging evidence did not violate the defendant's constitutional right to present a defense or to cross-examine witnesses).

Defendant sought to introduce the photographs of the text message exchange between Mr. Nichols and "D. Rex" and the portion of the recorded interview during which investigators questioned Mr. Nichols about the exchange to show that Mr. Nichols was the perpetrator based on the theory that Mr. Nichols was a pill addict and would not have rejected the pills offered by "D. Rex" unless Mr. Nichols already had the victim's supply of pills. Defendant did not specify in the trial court or in his appellate brief what portion of the recording of the almost two-hour interview of Mr. Nichols that Defendant sought to admit as related to the text message exchange. Accordingly, Defendant has waived his challenge to the trial court's exclusion of the portion of the recording. *See* Tenn. Ct. Crim. App. R. 10(b) ("Issues which are not supported by . . . appropriate references to the record will be treated as waived in this court."). Furthermore, Defendant's claim that Mr. Nichols rejected the "Hydro 10s" because he was "pill rich" and that he must have obtained the pills from the victim is based on pure speculation and requires leaps of logic that are not supported by this evidence or any other evidence presented at trial. As noted by the trial court, other evidence was presented at trial indicating that Mr. Nichols was a drug addict who had previously stolen from the victim. Given the speculative nature of Defendant's argument regarding the relevancy of the evidence and the introduction of other evidence at trial relating to Mr. Nichols's drug use and prior theft, we cannot conclude that the evidence

of the text message exchange was critical to the defense. Accordingly, the trial court's exclusion of the evidence did not violate Defendant's right to present a defense.

Defendant also asserts that the trial court's rulings violated his constitutional right to effective assistance of counsel. However, Defendant has waived this issue by failing to support his claim with argument and citation to authority. *See* Tenn. Ct. Crim. App. R. 10(b).

*Admission of Entire Recording of Defendant's Interview and Photographs of Defendant*

Defendant asserts that the trial court erred in admitting the entire audio recording of his interview with the police and the two photographs taken of him during the interview. Defendant maintains that the portion of the recording after he requested counsel and the photographs were irrelevant and unfairly prejudicial. He also maintains that the photographs were cumulative to other evidence presented at trial, including evidence of his identity as the interviewee. The State responds that Defendant waived his challenge to the admission of the entire audio recording of the interview by failing to make an adequate record and that the trial court properly exercised its discretion in admitting the entire recording and the photographs.

Evidence must be relevant to be admissible. Tenn. R. Evid. 402. Evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Tenn. R. Evid. 401. However, relevant evidence "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Tenn. R. Evid. 403. Unfair prejudice is generally defined as "[a]n undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one." *State v. Banks*, 564 S.W.2d 947, 951 (Tenn. 1978); *see State v. Young*, 196 S.W.3d 85, 106 (Tenn. 2006) ("Prejudice becomes unfair when the primary purpose of the evidence at issue is to elicit emotions of 'bias, sympathy, hatred, contempt, retribution, or horror.'") (internal citation omitted).

Questions regarding the admissibility and relevance of evidence generally lie within the discretion of the trial court, and the appellate courts will not "interfere with the exercise of that discretion unless a clear abuse appears on the face of the record." *State v. Franklin*, 308 S.W.3d 799, 809 (Tenn. 2010) (citing *State v. Lewis*, 235 S.W.3d 136, 141 (Tenn. 2007)). An abuse of discretion occurs when the trial court (1) applies an incorrect legal standard; (2) reaches an illogical or unreasonable decision; or (3) bases its decision on a clearly erroneous assessment of the evidence. *State v. Mangrum*, 403 S.W.3d 152, 166 (Tenn. 2013) (citing *Lee Med., Inc. v. Beecher*, 312 S.W.3d 515, 524 (Tenn. 2010)).

As the audio recording of Defendant's interview was being played at trial, defense counsel asked to approach the bench. During a bench conference, defense counsel stated, "I think that might be through the relevant part. I'm not sure. Is there anything relevant after that part?" The prosecutor requested that the entire recording be played and argued that the interview was relevant to Defendant's demeanor and credibility. Defense counsel responded, "It's just him sounding like an a**hole. I mean, it's just him being aggressive on the rest of it." The trial court ruled that the State could play the entire recording and announced to the jury that "we're going to pick up where we left off." The record reflects that the remainder of the recording was played.

As noted by the State, the record does not reflect the portion of the recording to which defense counsel objected. On appeal, Defendant asserts that defense counsel challenged the portion of the recording after Defendant requested counsel and cites to a motion to suppress filed before trial. However, the defense sought suppression of this portion of the interview pretrial alleging constitutional violations not based on Rules 401 and 403 of the Tennessee Rules of Evidence. Neither the transcript of the suppression hearing nor the trial court's order addressing the suppression motion are included in the appellate record. Accordingly, we cannot rely upon the pretrial motion to suppress in determining what portion of the interview that defense counsel challenged at trial as irrelevant and unfairly prejudicial. Furthermore, in light of Defendant's behavior throughout the interview, defense counsel's statements during the bench conference do not serve to narrow the portion of the interview to which he objected at trial.

"When a party seeks appellate review there is a duty to prepare a record which conveys a fair, accurate and complete account of what transpired with respect to the issues forming the basis of the appeal." *State v. Ballard*, 855 S.W.2d 557, 560 (Tenn. 1993). Thus, in the absence of a complete record, "the appellate court must conclusively presume that the ruling of the trial judge was correct." *State v. Draper*, 800 S.W.2d 489, 493 (Tenn. Crim. App. 1990). Because the record does not reflect the portion of the recorded interview that defense counsel claimed at trial was irrelevant and unfairly prejudicial, Defendant has failed to establish that he is entitled to relief.

Defense counsel also objected to the admission of the photographs taken of Defendant during the interview as irrelevant and argued that even if the State needed to establish that Defendant was the interviewee, the State could have done so without the photograph depicting Defendant with both thumbs up. The trial court overruled the objection, concluding that the photographs were relevant to show Defendant's demeanor.

"A trial court has broad discretion regarding the admissibility of photographs." *State v. Davidson*, 509 S.W.3d 156, 198 (Tenn. 2016). Before a photograph is admissible,

it must be verified and shown to be relevant, and the trial court must weigh its probative value against the danger of unfair prejudice. *Id*. A relevant photograph "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice." *Id*. at 198-99.

The photographs depicting Defendant's demeanor during the interview were relevant to allow the jury to assess the credibility of Defendant's statements during the interview and to compare Defendant's demeanor with evidence of the demeanor of Mr. Nichols, who Defendant alleged at trial killed the victim. Because the interview was only audio recorded, the photographs were the only visual evidence illustrating Defendant's body language during the interview and, thus, were not cumulative to other evidence presented at trial. Furthermore, we cannot conclude that the probative value of the photographs is substantially outweighed by the danger of unfair prejudice. *See* Tenn. R. Evid. 403. Accordingly, the trial court did not abuse its discretion in admitting the photographs.

*Admission of Polygraph Evidence*

Defendant contends that the trial court erred in overruling defense counsel's objection to Investigator Maupin's testimony about Mr. Nichols's willingness to submit to a polygraph examination. Defendant argues that the testimony improperly bolstered Mr. Nichols's credibility and allowed the jury to infer that Investigator Maupin believed Defendant was guilty because he did not volunteer to submit to a polygraph examination. The State responds that Defendant is not entitled to relief because he failed to take reasonably available steps to cure the error.

The prosecutor asked Investigator Maupin on redirect examination about Mr. Nichols's demeanor during the interview and its effect on the investigator, and Investigator Maupin responded:

> Just based on my experience investigating these type crimes and other crimes and people want to lie to police and stuff, I felt like he was—wasn't involved, just based on his body language and things he said. He was willing to come back next Monday and do a polygraph, just wanted to clear his name and was really anxious for us to find the killer.

Defense counsel objected, arguing that "[e]veryone in the room is well aware that polygraphs aren't supposed to be mentioned in the court of law." The trial court overruled the objection, and the prosecutor announced that she was "not going any further with that." The prosecutor continued questioning Investigator Maupin about Mr. Nichols's demeanor but did not mention the offer to submit to a polygraph examination.

- 33 -

On recross-examination, defense counsel asked Investigator Maupin, "Just one thing, since the cat's out of the bag anyways, the question where you managed to get the word 'polygraph' out, that was a question about his demeanor right?" The prosecutor asked permission to approach the bench. During a bench conference, the trial court stated that it mistakenly believed that Mr. Nichols's interview with police had already been entered into evidence and that the court likely would have sustained the objection otherwise. The prosecutor suggested a curative instruction. The trial court acknowledged that "[i]t's my fault" and asked defense counsel whether he wanted a curative instruction or would rather address the issue on cross-examination. Defense counsel responded, "I'd rather just cross on it, your Honor. It's in the room now. You can't unring a bell."

In response to questioning by defense counsel, Investigator Maupin testified that a polygraph examination was never administered to Mr. Nichols. Investigator Maupin stated that he was aware that he was not to testify about a polygraph examination as it related to a defendant or the results of a polygraph examination. Investigator Maupin said he was unaware that he was prohibited from making any mention of a polygraph examination. He explained that he used it as a tool to ascertain Mr. Nichols's reaction when it was suggested to him. The prosecutor announced that the State conceded that polygraph evidence is not admissible in Tennessee courts. Defense counsel stated that he did not want anyone to be left with the impression that Mr. Nichols passed a polygraph examination, and the trial court responded, "We know. It wasn't taken."

"'Tennessee courts have held repeatedly that polygraph test results, testimony concerning such results, and testimony concerning a defendant's willingness or refusal to submit to a polygraph test are inadmissible.'" *State v. McCaleb*, 582 S.W.3d 179, 189 (Tenn. 2019) (quoting *State v. Damron*, 151 S.W.3d 510, 515 (Tenn. 2004)). "'Because polygraph evidence is not considered reliable, it is irrelevant.'" *Id.* (quoting *Damron*, 151 S.W.3d at 515-16). This court also has held that evidence of a witness's willingness to take a polygraph test is inadmissible. *See State v. Randall Kenneth Reed*, No. E2015-01638-CCA-R3-CD, 2017 WL 1959497, at *6-8 (Tenn. Crim. App. May 11, 2017) (holding that the trial court erred in allowing a witness to testify that he agreed to take a polygraph examination and that the defendant refused to take one); *State v. Adkins*, 710 S.W.2d 525, 529 (Tenn. Crim. App. 1985) (holding that "in the absence of unusual circumstances we cannot now anticipate, it is not relevant evidence whether a defendant, a victim, or a witness was willing to take a polygraph test …").

We note that the prosecutor did not solicit the initial testimony about Mr. Nichols's willingness to submit to a polygraph examination and did not revisit the testimony after the trial court overruled Defendant's objection. Once the trial court acknowledged that it erred in overruling the objection, Defendant did not request a mistrial and declined the trial

court's offer to issue a curative instruction. *See State v. Brian Larice Cureton*, No. M2002-00835-CCA-R3-CD, 2003 WL 22303084, at \*13-14 (Tenn. Crim. App. Oct. 8, 2003) (recognizing that a potential error resulting from unsolicited testimony about inadmissible evidence, such as polygraph evidence, may be cured by instructing the jury to disregard the comment), *perm. app. denied* (Tenn. Mar. 22, 2004). Tennessee Rule of Appellate Procedure 36(a) states that "[n]othing in this rule shall be construed as requiring relief be granted to a party responsible for an error or who failed to take whatever action was reasonably available to prevent or nullify the harmful effect of an error." The Advisory Comments clarify that "[t]he last sentence of this rule is a statement of the accepted principle that a party is not entitled to relief if the party invited error, waived an error, or failed to take whatever steps were reasonably available to cure an error." Tenn. R. App. P. 36(a), Advisory Comm'n Cmts. By failing to request a mistrial or agree to a curative instruction, Defendant did not take reasonably available steps to cure the error. Rather, Defendant chose to question Investigator Maupin on cross-examination about the polygraph examination, thus potentially compounding the error. Accordingly, Defendant is not entitled to relief regarding this issue.

*Jury's Consideration of Lesser Included Offenses*

Before the jury retired for deliberations, the trial court instructed the jury regarding the elements of each charged offense and the applicable lesser included offenses, including facilitation of especially aggravated robbery and aggravated robbery as lesser included offenses of especially aggravated robbery. The trial court also issued a sequential jury instruction, informing the jury that it could not consider a lesser included offense until it unanimously acquitted Defendant of the immediately preceding greater offense.

During deliberations, the jury submitted a question, asking whether the language in the instruction that "the alleged victim suffered serious bodily injury" as an element of aggravated robbery" meant that Defendant caused the victim to suffer serious bodily injury. After consulting with the prosecutor and defense counsel, the trial court provided the jury with a supplemental instruction. The jury later requested a revised verdict form for count two, the especially aggravated robbery charge, because the form did not list the correct victim. The trial court provided a corrected verdict form. The jury subsequently returned a verdict, convicting Defendant of criminally negligent homicide as a lesser included offense of felony murder as charged in count one and especially aggravated robbery as charged in count two in the indictment. Once the jury foreperson read the verdict, the trial court asked the jurors to signify whether that was their individual verdict by raising their right hands. The trial court noted for the record that all twelve jurors raised their right hand.

- 35 -

Defendant asserts that the jury's question constitutes evidence that the jury considered a lesser included offense in count two of the indictment and then either (1) voted to acquit Defendant of the charged offense of especially aggravated robbery and changed their minds after receiving the corrected verdict form; (2) considered the lesser included offenses in violation of the sequential jury instruction; or (3) incorrectly marked the verdict form when the revised form was provided. Defendant maintains that "[r]egardless of the specific explanation, the jury's question coupled with the jury's acquittal on the first-degree felony murder charge, where the underlying felony was robbery, casts doubt on the validity of the jury's verdict and undermines the public's confidence in the verdict and the trial process."

Although Defendant asserts that the jury failed to abide by the trial court's sequential jury instruction, we must presume that the jury followed all instructions given by the trial court "'with commonsense understanding of the instructions in the light of all that has taken place at trial [that is] likely to prevail over technical hairsplitting.'" *State v. Knowles*, 470 S.W.3d 416, 426 (Tenn. 2015) (quoting *Boyde v. California*, 494 U.S. 370, 381 (1990)). "To overcome this presumption, the defendant must show by clear and convincing evidence that the jury failed to follow the trial court's instruction." *State v. Harbison*, 539 S.W.3d 149, 163 (Tenn. 2018) (citing *State v. Newsome*, 744 S.W.2d 911, 915 (Tenn. Crim. App. 1987)). The fact that the jury had a question about an element of one of the lesser included offenses, without more, does not constitute clear and convincing evidence that the jury disregarded the trial court's instructions and deliberated improperly. Defendant's claim that the jurors may have voted to acquit him of especially aggravated robbery and then changed their minds is nothing more than speculation. Finally, Defendant's claim that the jury incorrectly marked the verdict form upon receiving the revised verdict form is not supported by the record, which reflects that each juror affirmed the verdict after it was read. Accordingly, Defendant has failed to establish that he is entitled to relief on this issue.

*Cumulative Error*

Defendant argues that the cumulative effect of errors committed by the trial court entitles him to relief. The cumulative error doctrine applies to circumstances in which there have been "multiple errors committed in trial proceedings, each of which in isolation constitutes mere harmless error, but when aggregated, have a cumulative effect on the proceedings so great as to require reversal in order to preserve a defendant's right to a fair trial." *State v. Hester*, 324 S.W.3d 1, 76 (Tenn. 2010). However, Defendant has failed to establish any error entitling him to relief when considered either individually or cumulatively.

### *Conclusion*

Upon reviewing the record, the parties' briefs and oral arguments, and the applicable law, we affirm the judgments of the trial court.

_____
TIMOTHY L. EASTER, JUDGE